UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARNALDO GIAMMARCO, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:13-cv-01670 (VLB) |
| | : | |
| | : | March 17, 2016 |
| RAND BEERS, | : | |
| ALEJANDRO MAYORKAS, AND | : | |
| JAMES COMEY, | : | |
|     Defendants. | : | |

MEMORANDUM OF DECISION GRANTING PLAINTIFF'S [Dkt. #23] CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT [Dkt. #18]

Plaintiff Arnaldo Giammarco ("Giammarco") and Defendants Rand Beers, on behalf of the Department of Homeland Security ("DHS"), and Alexander Majorkas, on behalf of the U.S. Citizenship and Immigration Services ("USCIS"), have moved for summary judgment.[1]  For the reasons that follow, Defendants' motion is DENIED and Plaintiff's cross-motion is GRANTED.

I.    Factual Background

Plaintiff entered the United States in 1960, as a lawful permanent resident. [Dkt. #50-2, Pl.'s Local Rule 56(a)(1) Statement at ¶ 1; Dkt. #52-1, Defs.' Local Rule 56(a)(2) Statement at ¶ 1].  In 1976, he enlisted in the U.S. Army, was stationed abroad, and in 1979, Plaintiff was honorably discharged.  [Dkt. #50-3, A. Giammarco Decl. at ¶¶ 5-6; Dkt. #50-6, Ex. B. to Pl.'s Cross-Mot. at 1].  On February 3, 1982, Plaintiff submitted an application for naturalization to the

---

[1] The Complaint also named as a defendant, FBI Director James Comey.  [Dkt. #1].  However, Plaintiff has requested and the Court grants the dismissal of all claims against this Defendant.  [Dkt. #50-1, Pl.'s Memo. at 10 n. 4].

1

Immigration and Naturalization Service ("INS"), which, at that time, was the agency responsible for processing, advising applicants, and filing petitions for naturalization.  [Dkt. #49-2, Defs.' Local Rule 56(a)(1) Statement at ¶ 4; Dkt. #51-4, Pl.'s Local Rule 56(a)(2) Statement at ¶ 4].[2]  Plaintiff's application disclosed a January 1981 arrest for sexual assault in the first degree, and stated that the charge was "still pending."  [Dkt. #49-3, Ex. 1 to Defs.' Mot. at 2].

On April 8, 1982, Plaintiff met with an INS agent, who reviewed his application.  [Dkt. #49-2, Defs.' Local Rule 56(a)(1) Statement at ¶ 6; Dkt. #51-1, Pl.'s Local Rule 56(a)(2) Statement at ¶ 6].  During the meeting, Plaintiff and the agent discussed the sexual assault charge, and the INS agent told Plaintiff that he should inform the agency when the disposition of this criminal charge became available.  [Dkt. #49-2, Defs.' Local Rule 56(a)(1) Statement at ¶¶ 7, 9; Dkt. #51-1, Pl.'s Local Rule 56(a)(2) Statement at ¶¶ 7, 9].  Later that day, the INS agent drafted a memo to Plaintiff's file, which stated that the charge against Plaintiff was "still pending because [Plaintiff] requested a jury trial" and as a result, the

---

[2] Until the Immigration Act of 1990 ("IMMACT"), federal and certain state courts had the authority to grant or deny naturalization petitions.  [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶ 3].  Accordingly, individuals seeking naturalization were required to file two documents, an application to file a petition for naturalization, which was reviewed by the INS, and a separate petition for naturalization, which was adjudicated by a court.  *See Azize v. Bureau of Citizenship & Immigration Servs.*, 594 F.3d 86, 90 (2d Cir. 2010); *U.S. v. Sokolov*, 814 F.2d 864, 869 (2d Cir. 1987).  The application was a necessary precursor to filing a petition.  8 U.S.C. § 1445(b)(2) (1982).  In addition to receiving and processing applications to file petitions for naturalization, the INS screened applicants to ascertain if they were likely to be eligible for naturalization.  [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶¶ 2-3].  In this role, the INS would conduct an interview of the applicant, review his or her application, and, upon determining that the applicant was qualified, facilitate the applicant's filing an actual petition for naturalization.  [*Id.* at ¶ 3].  Applicants whom the INS deemed unlikely to qualify for naturalization could contest this determination and move forward with a petition, but such cases were "very rare."  [*Id.* at ¶ 4].

officer would "defer filing [Plaintiff's naturalization petition] until disposition of case." [Dkt. #49-3, Ex. 2 to Defs.' Mot. at 1].  Also after this meeting, Plaintiff's naturalization application was marked "[n]onfiled." [Dkt. #49-3, Ex. 1 to Defs.' Mot. at 4].  In the space provided for "Date, Reasons," the reviewing officer wrote "[s]ee memo to file of 4-8-82." [*Id.*].  According to a sworn declaration submitted by the Defendants, at and around the time Plaintiff submitted his naturalization application, when an INS examiner designated an applicant's file as "nonfiled" they were not obligated or expected to issue a written notification to the applicant disclosing this fact.  [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶ 5].  Moreover, applications that received a "nonfiled" designation could be revived, if the applicant provided the INS with the information it requested, or otherwise contacted the INS.  [*Id.* at ¶ 8].

On September 27, 1982, Plaintiff sent a letter to the INS informing them that the sexual assault charge had been "nolle[]d" and requesting "an appointment for a[c]quiring [his] U.S. [c]itizenship." [Dkt. #49-3, Ex. 5 to Defs.' Mot. at 1].[3]  The letter further explained that Plaintiff "was told to make another appointment when the case had reached a decision." [*Id.*].  According to a document from the Hartford Superior Court, the charge was nolled on or around August 23, 1982.

---

[3] "The effect of a nolle is to terminate the particular prosecution of the defendant without an acquittal and without placing him in jeopardy." *State v. Richardson*, 291 Conn. 426, 430, 969 A.2d 166 (Conn. 2009).  However, a nolle does not protect the defendant from further prosecution in connection with the same underlying conduct.  *See Hing Wan Wong v. Liquor Control Commission*, 160 Conn. 1, 5, 273 A.2d 709, 711 (Conn. 1970) ("The nolle . . . was not a bar to a subsequent trial of the plaintiff for the same offense.").  Nor does a nolle constitute a dismissal—at least not until thirteen months has passed, such that the charge is automatically erased under Conn. Gen. Stat. § 15-142a(c).  *See Cislo v. City of Shelton*, 240 Conn. 590, 607, 692 A.2d 1255, 1264-65 (Conn. 1997).

*See* [Dkt. #50-6, Ex. K at 2].  However, Plaintiff did not present this or any other documentary evidence regarding the nolle to the INS or the Defendants in this case until January 2014, long after a final order of removal was issued against him.  [*Id.* at 1].

The INS received Plaintiff's letter on October 4, 1982.  [Dkt. #49-3, Ex. 5 to Defs.' Mot. at 1].  A handwritten note in Plaintiff's INS file indicates that on the same day the INS received his letter, "10/4/82," it decided to "[r]eopen" his file.  [Dkt. #50-6, Ex. L to Pl.'s Cross-Mot. at 1].[4]  On October 12, 1982, the INS sent the Hartford Police Department a records request, seeking the disposition of the January 1981 charge.  [Dkt. #50-6, Ex. G to Pl.'s Cross-Mot. at 1].  On October 26, 1982, the INS received a response, in the form of a table depicting the date and nature of the offense and the case number, with no disposition provided.  [*Id.* at 2].  The following day, October 27, 1982, the INS prepared a letter to Plaintiff which instructed him to provide the INS with a certified copy of the disposition of

---

[4] Defendants contend that it "is not discernable from the record" whether or not the INS reopened Plaintiff's application.  [Dkt. #52-1, Defs.' Local Rule 56(a)(2) Statement at ¶ 11].  However, they offer no alternative explanation for the seemingly straightforward statement appearing in the file: "Reopen 10/4/82." [Dkt. #50-6, Ex. L to Pl.'s Cross-Mot. at 1].  Nor do they directly dispute that the INS reopened Plaintiff's file.  They merely question, without support, whether this statement is sufficient to indicate that the file was reopened.  The Court finds, in the absence of any evidence to the contrary, that it is.  Indeed, the remainder of the Defendants' response *supports* this conclusion.  Defendants state that the handwritten note was "the next to last page in [Plaintiff's] file" and "[t]he last page" was a "file copy of the October 27, 1982" letter the INS allegedly sent to Plaintiff requesting additional information regarding the disposition of the sexual assault charge.  [Dkt. #52-1, Defs.' Local Rule 56(a)(2) Statement at ¶ 11].  The presence of this letter (whether in draft or final form) in Plaintiff's file would appear to support the conclusion that the file was reopened, because if it were not, there would be no reason for the INS to have made a second, written request for this information, especially since it was apparently under no obligation and typically did not inform applicants when their applications were designated "nonfiled."  *See* [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶ 5].

the charge.  [Dkt. #49-3, Ex. 6 to Defs.' Mot. at 1].  Plaintiff contends that neither he nor any of his family members ever received this letter.  [Dkt. #50-2, Pl.'s Local Rule 56(a)(1) Statement at ¶ 16; Dkt. #52-1, Defs.' Local Rule 56(a)(2) Statement at ¶ 16].  No further communication ever occurred between Plaintiff and the INS in connection with this application.  [*Id.* at ¶¶ 16-17].

Nearly six years later, on September 21, 1988, the FBI prepared a report concerning the January 1981 charge against Plaintiff.  [Dkt. #50-6, Ex. H to Pl.'s Cross-Mot. at 1].  The report was prepared from information provided by the Hartford Police Department, and it referenced the sexual assault charge and Plaintiff's January 1981 arrest.  [*Id.*].  However, it did not include a disposition. [*Id.*].  Although this report was placed in Plaintiff's INS file, there is no indication which entity requested the report and when it did so.   [*Id.*; *see also* Dkt. #52-1, Defs.' Local Rule 56(a)(2) Statement at ¶ 14].  Following the INS's receipt of this report, there is no indication that any action was taken, that the INS contacted Plaintiff, or that the INS closed Plaintiff's file.[5]

Defendants contend that where a naturalization application was submitted to the INS but contained deficiencies which prevented it from filing a petition with the court, the policy of the INS prior to the passage of IMMACT was to retain the application for a limited period of time, and, if the applicant did not provide the missing information the INS requested and it otherwise appeared that the application had been abandoned, the INS would archive it in the ordinary course

---

[5] Defendants have submitted a sworn declaration stating that "there is no indication in [Plaintiff's] record that the pendency of any inquiry made to the FBI played any part in the status or handling of the Plaintiff's application."  [Dkt. #49-4, Ex. 200, Keck Decl. at ¶ 5].  That the FBI inquiry may not have affected the status or handling of Plaintiff's application does not mean that it is not evidence of that status.

of business.  [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶¶ 10-11].  Nowhere do
Defendants contend that the INS rendered an ultimate determination on or
otherwise terminated applications that it deemed abandoned, nor do they
maintain that the INS closed files containing abandoned applications within any
period of time.  Accordingly, there is no indication in the record if and when the
INS deemed Plaintiff's application abandoned, and that, at any time after October
4, 1982, the agency closed or otherwise reached a decision on his application.
[*Id.* at 1-2; Dkt. #49-4, Ex. 200, Keck Decl. at ¶ 5].

 On January 21, 1997, and while his application was in this dormant state,
Plaintiff was convicted of the offense of larceny in the fifth degree.  [Dkt. #49-2,
Defs.' Local Rule 56(a)(1) Statement at ¶ 16; Dkt. #51-1, Pl.'s Local Rule 56(a)(2)
Statement at ¶ 16].  Shortly thereafter, on March 3, 1997, Plaintiff was convicted of
larceny in the sixth degree.  [Dkt. #49-2, Defs.' Local Rule 56(a)(1) Statement at ¶
17; Dkt. #51-1, Pl.'s Local Rule 56(a)(2) Statement at ¶ 17].  On November 5, 2004,
Plaintiff was arrested again, for possession of narcotics.  [Dkt. #49-2, Defs.' Local
Rule 56(a)(1) Statement at ¶ 18; Dkt. #51-1, Pl.'s Local Rule 56(a)(2) Statement at ¶
18].  These three offenses served as the basis for the INS's decision to seek
Plaintiff's removal.  [Dkt. #49-3, Ex. 8 to Defs.' Mot. at 4].

 On January 23, 2007, Plaintiff was convicted of larceny in the fourth degree
and was sentenced to one year of imprisonment, execution suspended after 30
days.  [Dkt. #49-2, Defs.' Local Rule 56(a)(1) Statement at ¶ 19; Dkt. #51-1, Pl.'s
Local Rule 56(a)(2) Statement at ¶ 19].  The INS determined that this last offense,
larceny in the fourth degree, constituted an aggravated felony.  [Dkt. #49-3, Ex. 9
to Defs.' Mot. at 3].  This determination is significant because one who has

6

committed an "aggravated felony," as defined by the immigration statutes, is generally precluded from cancelling a removal proceeding.  [*Id.*].  Commission of an aggravated felony also generally prevents an applicant from satisfying the statutory good moral character requirement for naturalization.  *See* 8 U.S.C. § 1101(f)(8) ("No person shall be regarded as . . . a person of good moral character who . . . at any time has been convicted of an aggravated felony . . . .").[6]

On May 14, 2011, Plaintiff was arrested by officers of Immigration and Customs Enforcement ("ICE") and placed in removal proceedings.  [Dkt. #50-2, Pl.'s Local Rule 56(a)(1) Statement at ¶ 27; Dkt. #52-1, Defs.' Local Rule 56(a)(2) Statement at ¶ 27].  Sometime in 2011, Plaintiff's counsel made a FOIA request of Defendant DHS.  [Dkt. #50-3, A. Giammarco Decl. at ¶ 14].  It was through the documents obtained from this request that Plaintiff claims he first learned of the October 27, 1982 letter prepared by the INS and that his application had been designated as "non-filed."  [*Id.*].

On May 15, 2012, an immigration judge ("IJ") entered an order of removal and denied Plaintiff's request for a cancellation of removal.   [Dkt. #50-2, Pl.'s Local Rule 56(a)(1) Statement at ¶ 29; Dkt. #52-1, Defs.' Local Rule 56(a)(2) Statement at ¶ 29].  In reaching his decision, the IJ found that Plaintiff had "conceded the allegations and the two charges of removability," and that there was "clear, convincing and unequivocal evidence that the allegations . . . [we]re true."  [Dkt. #49-3, Ex. 9 to Defs.' Mot. at 2-3].  He denied Plaintiff's application for cancellation of removal upon concluding that Plaintiff was "ineligible for that

---

[6] Among the offenses which constitute aggravated felonies for immigration and naturalization purposes are theft offenses for which the term of imprisonment is at least one year.  *See* 8 U.S.C. § 1101(a)(43)(G).

form of relief because he has been convicted of an aggravated felony" based on his January 5, 2007 conviction for fourth-degree larceny.  [*Id.* at 3].  Finally, the IJ considered Plaintiff's assertion that he was "pursuing an old application" for naturalization, an independent basis for avoiding removal.  [*Id.*].  However, the IJ concluded that this application "was never acted upon," after the USCIS took the position that the application "was never properly filed because [Plaintiff] never went through the proper process."  [*Id.* at 4].  The IJ opinion cites to an exhibit, but does not indicate that the USCIS formally considered and reached a final decision regarding the naturalization application, nor does it identify when the USCIS took this position, in what form, and whether Plaintiff was ever given notice or an opportunity to appeal it.  [*Id.*].

On October 1, 2012, the Board of Immigration Appeals ("BIA") issued its decision affirming the removal order.  [Dkt. #50-6, Ex. I to Pl.'s Cross-Mot. at 1].  In dismissing Plaintiff's appeal, the BIA discussed Plaintiff's earlier naturalization application and the USCIS's stated "position . . . that the application was never completed at the time it was filed," and that as a result, there was "no application currently pending before the USCIS."  [*Id.*].  The BIA further noted that "the DHS has exclusive jurisdiction over naturalization determinations," and thus, the BIA was bound to accept the DHS's determination.  [*Id.*].  However, like the IJ opinion, the BIA opinion does not set forth facts demonstrating that the "position" taken by the USCIS constituted a final agency decision which was communicated to Plaintiff and to which Plaintiff received an opportunity to appeal.

On November 26, 2012, Plaintiff was deported to Italy, where he presently resides.  [Dkt. #50-6, Ex. J to Pl.'s Cross-Mot. at 2].

8

## II.   Legal Standards

### A.   Summary Judgment

Defendants moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the alternative for summary judgment pursuant to Fed. R. Civ. P. 56.  [Dkt. #49].  Plaintiff cross-moves for summary judgment.  [Dkt. #50]. In deciding whether to treat a motion as one for summary judgment, "[t]he essential inquiry is whether the . . . [parties] . . . should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or [were] taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."  *In re G&A Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985).  Here, in addition to cross-moving for summary judgment, Plaintiff relies on documents outside of the pleadings and submits a Local Rule 56(a)(2) statement in opposition to the Defendants' motion.  *See* [Dkt. ##51-1-5]. Accordingly, the Court evaluates each of the parties' motions under the Rule 56 standard.  *See Eidshahen v. Pizza Hut of Am., Inc.*, 973 F. Supp. 113, 114 (D. Conn. 1997) (treating defendant's motion to dismiss pursuant to Rule 12, or, in alternative, motion for summary judgment as motion for summary judgment where "[p]laintiff submitted materials outside the pleadings, including an affidavit" and "briefed for a motion for summary judgment"); *Mendoza v. City of Rome*, 70 F. Supp. 2d 137, 141 (N.D.N.Y. 1999) (treating defendant's motion as one for summary judgment where both parties "referred to documents outside of the pleadings").

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.,* 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing and quoting *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21,

2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

## B. <u>Administrative Procedure Act</u>

To bring a claim under the APA, a plaintiff must show "(1) a clear duty owed to [him] under by the agency, (2) a duty which is mandatory and not discretionary, and (3) a clear right to relief."  *Nigmadzhanov v. Mueller*, 550 F. Supp. 2d 540, 548 (S.D.N.Y. 2008) (citation omitted).  The APA imposes a number of requirements on federal agencies.  One requirement is, "within a reasonable time . . . to conclude a matter presented to it."  5 U.S.C. § 555(b).  Thus, a court may "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  However, it may do so only when "an agency failed to take a *discrete* agency action that it is *required to take.*"  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64, 124 S. Ct. 2373, 2379 (2004) (emphasis in original).  A court may not review "agency action [that] is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Accordingly, "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."  *Norton*, 542 U.S. at 65, 124 S. Ct. at 2380.

Where an APA claim is based on unreasonable delay, courts consider six factors:

> (1) the time agencies take to make decisions must be governed by a 'rule of reason;' (2) where Congress has provided a timetable or

other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'

*Yakubova v. Chertoff*, No. 06 CV 4203 (ERK) (RLM), 2006 WL 6589892, at **3-4 (E.D.N.Y. Nov. 2, 2006) (quoting *Tummino v. Von Eschenbach*, 427 F. Supp. 2d. 212, 231 (E.D.N.Y. 2006) (applying factors to complaint alleging delays in adjudication of naturalization applications by USCIS)).

The duty to resolve applications within a reasonable time applies to DHS and USCIS adjudications of immigration applications, and serves as a proper basis for a claim under the APA. *See, e.g., Eid v. Chertoff*, No. 07-cv-201 (JBA), 2008 WL 905927, at *4 (D. Conn. Mar. 31, 2008) (denying motion to dismiss APA claim against Secretary of DHS for failure to resolve plaintiff's adjustment of status application for more than four years and stating that "[n]othing in the INA relieves the Secretary of his obligation to dispose of pending adjustment of status applications in a reasonable time frame to give applicants prompt notice of those decisions"); *Nigmadzhanov*, 550 F. Supp. 2d at 547 (finding that defendant "CIS had a non-discretionary duty to adjudicate [plaintiff's] application for adjustment within a reasonable amount of time" and that having alleged that CIS breached its duty, plaintiff "stated a clear claim for relief" under APA).[7]

---

[7] There is case law holding that the DHS and USCIS' duty to timely adjudicate naturalization applications is not triggered until the completion of the FBI's criminal background check. *See Kakushadze v. Chertoff*, No. 07 Civ. 8338 (DF), 2008 WL 2885292, at *7 (S.D.N.Y. Jul. 25, 2008) ("[US]CIS does not have a

Similarly, when an agency issues a denial, "in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding," it is required to give "[p]rompt notice . . . of the denial." 5 U.S.C. § 555(e) (1982). While the Second Circuit has not reached the issue, courts elsewhere have found that the DHS and USCIS must comply with this statute in the course of their review of applications. *See, e.g., Beshir v. Holder*, 853 F. Supp. 2d 1, 6 n. 4, 10-11 (D.D.C. 2011) (citing § 555(e) and holding that court had jurisdiction under the APA to hear complaint challenging agency inaction with respect to plaintiff's application to adjust her immigration status); *Fraga ex rel. Fraga v. Smith*, 607 F. Supp. 517, 522 (D. Or. 1985) (citing § 555(e) in holding that the APA "requires INS to issue a final written decision" in connection with applications for certificates of citizenship). As is the case with a failure to render a decision, "the usual remedy" for an agency's failure to satisfy the notice requirement in the event of a denial is a "'remand to the agency for additional investigation or explanation.'" *Tourus Records, Inc. v. Drug Enforcement Admin.*,

---

mandatory duty to take action on an application for naturalization until the FBI has completed its background checks.") (quoting *Abdul Qadir v. Gonzalez*, No. 07-3741 (FLW), 2008 WL 2625314, at *4 (D. N.J. Jun. 26, 2008) (dismissing APA claim based on DHS delay in adjudicating naturalization application). However, Defendants do not raise this argument. In addition, as Defendants acknowledge, 8 U.S.C. § 1447(b) permits a naturalization applicant to request a hearing before a district court in the event of undue delay on the part of the agency, but they claim that this statute does not apply in this case because it was not enacted until 1990. [Dkt. #49-1, Defs.' Memo. at 13]. Defendants' argument assumes that Plaintiff's application was disposed of prior to 1990, but, as discussed below, *see infra* at 17-18, the record plainly indicates that Plaintiff's naturalization application was pending in 1990 and remains so today. Furthermore, Plaintiff relies on this statute in bringing his Complaint. *See* [Dkt. #1, Compl. at ¶¶ 74, 77]. Accordingly, to the extent the APA does not provide for a cause of action to redress the 30-year delay in adjudicating Plaintiff's application, 8 U.S.C. § 1447(b) certainly does.

259 F.3d 731, 737 (D.C. Cir. 2001) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S. Ct. 1598, 1607 (1985)).

III.   <u>Analysis</u>

    A.   <u>The INS Breached its Duty to Timely Adjudicate Plaintiff's Naturalization Application</u>

    At the time Plaintiff submitted his application, February 3, 1982, the INS, a federal agency, was under the general obligation to render a conclusion on the application within a "reasonable time."  5 U.S.C. § 555(b) (1982).  Applying the six-factor test, Plaintiff's application was not resolved within a reasonable time.  A three-decade long delay exceeds any rule of reason, particularly given that an application for citizenship touches upon the "health and welfare" of the applicant. *Yakubova*, 2006 WL 6589892, at *3.

    In response, Defendants dispute the applicability of this provision of the APA by claiming that it applies only to actions that are "legally *required*."  [Dkt. #49-1, Defs.' Memo. at 12 (quoting *Norton v. S. Utah Wilderness Allliance*, 542 U.S. 55, 63-64, 124 S. Ct. 2373, 2379 (2004) (emphasis in original))].  According to Defendants, no action was or is required with respect to Plaintiff's naturalization application because (i) at the time Plaintiff submitted it, the INS did not adjudicate applications for naturalization, it only made non-binding recommendations to a district court as to whether citizenship should be granted; and (ii) there is no pending application, because the Plaintiff abandoned it, resulting in its administrative closure and archival within a reasonable time.  *See* [Dkt. #49-1, Defs.' Memo. at 14-15; Dkt. #53, Defs.' Reply at 2-5].  Defendants are incorrect.

    First, Defendants' argument that the INS did not adjudicate naturalization applications is neither accurate nor apposite.  As Defendants note, applicants

seeking naturalization were required to file two documents, an application to file a petition for naturalization, which was reviewed by the INS, and a separate petition for naturalization, which was adjudicated by a court. *See Azize v. Bureau of Citizenship & Immigration Servs.*, 594 F.3d 86, 90 (2d Cir. 2010); *U.S. v. Sokolov*, 814 F.2d 864, 869 (2d Cir. 1987).  The application was a necessary precursor to filing a petition.  8 U.S.C. § 1445(b)(2) (1982).  In addition to receiving and processing applications to file petitions for naturalization, the INS screened applicants to ascertain if they were likely to be eligible for naturalization, by among other things, conducting a paper review and interview of the applicant. [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶¶ 2-3].  Upon determining that the applicant was qualified, the INS signed off on the application and assisted the applicant with the filing of a petition for naturalization with the court.  [*Id.* at ¶ 3].  In addition, the court most often adopted the agency's recommendation, and it was "very rare" for an applicant to obtain a petition without the endorsement of the INS.  [*Id.* at ¶ 4].  Considering that submission of an application to the INS was a prerequisite to filing a naturalization petition with a court, the INS conducted a paper and in-person review of each application and applicant, and it determined whether it would support and assist the applicant with the filing of a naturalization petition, it is clear that the INS performed an adjudication over the naturalization applications it received.  Indeed, while not conclusive, the INS's determinations on whether an application should be developed into a petition were rarely contradicted by courts reviewing associated petitions.  Thus, even if the Defendants are correct, that a "nonfiled" designation did not equate to the denial of an application, this does not mean that the INS did not perform *any*

adjudication, as an outright denial of an application is only one type of adjudication. *See Brue v. Gonzales*, 464 F.3d 1227, 1233 n. 3 (10th Cir. 2006) (a nonfiled designation on a naturalization application "indicates that a [naturalization] *petition* was not filed, not that the INS considered the Application to be 'nonfiled' or that the INS denied the Application or a petition") (emphasis in original).

Moreover, even if a "nonfiled" designation does not constitute an INS adjudication, the timing requirements in 5 U.S.C. § 555(b) are not limited to agency adjudications.  § 555(b) commands that, "within a reasonable time," an agency "*conclude a matter* presented to it." *Id.* (emphasis added).  Plaintiff submitted an application to the agency, as he was required, and sought a determination from the agency of whether or not he met the requirements for naturalization and whether the agency would support and assist him in the filing of a naturalization petition.  Plaintiff was entitled to a final determination of both of these questions, which collectively comprised the "matter" Plaintiff placed before the agency.

Finally, and relatedly, for the reasons explained below, *see infra* at 17-18, Plaintiff did not, nor has he yet received a final disposition from the agency. Plaintiff's application has been pending from 1982 to the present day.  Thus, even if the INS was not under a clear non-discretionary duty to adjudicate Plaintiff's application back in 1982, there is no question that the Defendants presently owe such a duty and have owed it for many years.  *See* 8 U.S.C. § 1447(b) (1994) ("If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is

conducted under such section, the applicant may apply to the United States district court . . . for a hearing on the matter").

The Defendants' second contention—that the agency did make a determination on Plaintiff's application, when it closed and archived it after concluding Plaintiff had abandoned it—is simply not supported by the record. While the application was marked "non-filed" and, at some point, was archived, there is simply no evidence that the INS ever (i) reached a final decision or (ii) finally closed Plaintiff's application file—administratively or otherwise.  To the contrary, the undisputed record indicates that his file was reopened on or around October 4, 1982, the same day the INS appears to have received the letter from Plaintiff notifying it that his case had been nolled and requesting a second interview to move forward with his application, and remains open to the present day.  *See* [Dkt. #49-3, Ex. 5 to Defs.' Mot. at 1; Dkt. #50-6, Ex. L to Pl.'s Cross-Mot. at 1].  There is no indication that a decision was ever made on the application, or that Plaintiff's file was ever closed or archived for any particular reason thereafter.  Indeed, the October 27, 1982 letter from the INS requesting additional records from the Plaintiff appears to confirm that the file was reopened and a decision had not yet been made, and the FBI report, which was placed in Plaintiff's file years later, strongly suggests that the file remained open long after the agency sent out its final communication to Plaintiff requesting the disposition of the assault charge.  *See* [Dkt. #49-3, Ex. 6 to Defs.' Mot. at 1; Dkt. #50-6, Ex. H to Pl.'s Cross-Mot. at 1].

Defendants do not identify any evidence indicating a subsequent determination or that the file was later closed.  At most, they submit an affidavit

17

which states that naturalization applications, *in general*, were "archived in the ordinary course of business" once it appeared they had been abandoned. [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶ 11]. The Defendants have not presented, and the Court has not found, authority indicating that archiving a file constitutes an official disposition or an otherwise recognized file status. That Plaintiff's application was archived says nothing of its status or disposition, it merely indicates where the file was physically located. Moreover, the Defendants offer no evidence as to when Plaintiff's file was archived or when and if it was deemed abandoned. With the undisputed record demonstrating that Plaintiff's application was never finally adjudicated or closed for over 30 years, Plaintiff has established a violation of 5 U.S.C. § 555(b).

### B. The INS Failed to Comply with its Statutory Duty to Notify Plaintiff of its Denial of His Request for a Second Interview

Plaintiff next contends that Defendants violated 5 U.S.C. § 555(e), by failing to inform him of the agency's denials of his requests. At the time Plaintiff submitted his application, Defendants were obligated to provide "[p]rompt notice" of "the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceedings." 5 U.S.C. § 555(e) (1982). Defendants contend that they did not violate their duty to notify because (i) a designation of "nonfiled" did not constitute a denial; and (ii) the closure and archiving of the file did not constitute a denial, but was instead a determination that the file did not contain the requisite proof for a petition to be filed. *See* [Dkt. #49-1, Defs.' Memo. at 14-15; Dkt. #53, Defs.' Reply at 4-5]. Neither of these arguments succeeds.

First, the Defendants' argument overlooks the Plaintiff's request for a

second "appointment for acquiring [his] U.S. citizenship," contained in his

September 27, 1982 letter to the INS.  [Dkt. #49-3, Ex. 5 to Defs.' Mot. at 1].  The

Defendants acknowledge that the Plaintiff "never received one," and there is no

evidence in the record that a written denial of this request was ever sent to the

Plaintiff.  [Dkt. #53, Defs.' Reply at 15].  Indeed, the October 27, 1982 letter the

Defendants claim was the final piece of correspondence the INS sent to Plaintiff

does not mention or otherwise refer to this request.  *See* [Dkt. #49-3, Ex. 6 to

Defs.' Mot. at 1].  The failure to provide Plaintiff with a written denial of his

request is alone sufficient to violate the APA.  *See* 5 U.S.C. § 555(e) (1982)

("Prompt notice shall be given of the denial in whole or in part of a . . . *request of*

*an interested person* made in connection with any agency proceeding.")

(emphasis added).

Second, Defendants' contention that Plaintiff's file was ultimately disposed

of and closed absent a denial simply does not comport with their descriptions of

agency policy and procedure, nor does it make sense.  Both 5 U.S.C. § 555(e) and

8 C.F.R. § 103.3(a) imposed a duty on the INS to notify applicants whenever their

applications were denied.  *See* 5 U.S.C. § 555(e) (1982) ("Prompt notice shall be

given of the denial . . . of a written application . . . ."); 8 C.F.R. § 103.3(a) (1982)

("Whenever a formal application . . . is denied, the applicant shall be given written

notice setting forth the specific reasons for such denial.").[8]  However, neither the

statute nor the regulation defined the terms "denial" or "denied."  The Defendants

have taken the position that neither a "nonfiled" designation nor the

administrative closure of an applicant's file constituted a "denial."  [Dkt. #49-1,

---

[8] 8 C.F.R. § 103.3(a) specifically governed INS officers' review of applications for
naturalization.  *See* 8 C.F.R. § 103.

Defs.' Memo. at 13; Dkt. #53, Defs.' Reply at 2-5]. The Defendants' construction is untenable, because if this were the case, under the protocol described in the declaration submitted by the Defendants, the INS would not have issued a single denial, and was *never* under any duty to notify any applicant as to the status of their naturalization application. This is because, according to the Defendants, the INS either determined an application was meritorious and assisted in preparing a petition, or it designated applications "nonfiled" and after a period of time, it administratively closed them. *See* [Dkt. #49-4, Ex. 201, Dorfman Decl. at ¶¶ 3-4, 10-11]. Nowhere does the INS review procedure outlined in the Defendants' declaration provide for a separate "denied" status, nor does any other document in the record.

On the other hand, the record indicates, and the Defendants appear to assert, that once an application was administratively closed, it was no longer under review. *See* [*id.* at ¶¶ 8, 10-11 (explaining that applicants with an outstanding request for information could "revive" their applications by providing the information, if they failed to do so, the case would "remain 'nonfiled' and retained in the field office for a limited period of time," and thereafter, the application was "archived in the ordinary course of business"); Dkt. #53, Defs.' Reply at 5 (stating that the INS closed Plaintiff's file because it "did not contain the requisite proof for a petition to be filed," that "[t]he obligation to act pursuant to the APA is only an obligation to 'conclude' the matter within a reasonable time," and contending that "[i]t is undisputed that the administrative closure took place within a reasonable period")]. Defendants cannot have it both ways. Either the application was reopened and never concluded, as the undisputed record

20

indicates and the Court so finds, or, as the Defendants maintain, Plaintiff's file was ultimately closed, at which the point, the agency's "nonfiled" designation and determination that Plaintiff had abandoned his application ripened into a final denial, but no denial notice was ever sent to the Plaintiff.  In either case, the Defendants have violated the APA, be it by failing to render a disposition, in violation of 5 U.S.C. § 555(b), or by failing to inform the Plaintiff of its ultimate denial of his application, in violation of 5 U.S.C. § 555(e).

**C.**     **Plaintiff Has Standing And His Requested Relief is Not Clearly Futile**

Defendants next contend that the Court is unable to grant the relief Plaintiff seeks for three reasons: (i) Plaintiff is subject to a final order of removal and is therefore barred from seeking naturalization by 8 U.S.C. § 1429; (ii) Plaintiff's 2007 conviction for larceny in the fourth degree, an aggravated felony, renders him unable to demonstrate good character, a pre-requisite for naturalization; and (iii) Plaintiff is no longer a lawful permanent resident.  *See* [Dkt. #49-1, Defs.' Memo. at 16-24].  None of these arguments succeed.

As for the final removal order itself barring consideration of Plaintiff's naturalization application, his honorable service in the U.S. military during the years 1976-1979 places him outside the categorical bar on naturalization imposed by 8 U.S.C. § 1429.  *See* 8 U.S.C. § 1440(a)-(b)(1) (permitting any person who, "while an alien or a noncitizen national of the United States, has served honorably  . . . during . . . the Vietnam hostilities . . . [to] be naturalized . . . notwithstanding the provisions of section 1429 . . . as they relate to deportability"); *Boatswain v. Ashcroft*, 267 F. Supp. 2d 377, 378 (E.D.N.Y. 2003) (citing 8 U.S.C. § 1429 and noting that it "permit[s] veterans to naturalize

notwithstanding any final order of removal"), *aff'd sub nom Boatswain v. Gonzalez*, 414 F.3d 413 (2d Cir. 2005).[9]

Defendants' other two arguments fare no better.  While consideration of Plaintiff's 2007 fourth-degree larceny conviction and the loss of his lawful permanent resident status due to the final removal order may well result in the denial of his naturalization application, it is not clear to the Court that the agency must, or even should, consider either of these facts.  Plaintiff originally submitted his application in February 1982, it was never disposed of and remains open, the fourth degree larceny conviction occurred *25 years* later, and his removal took place another five years after that.  [Dkt. #49-2, Defs.' Local Rule 56(a)(1) Statement at ¶ 19; Dkt. #51-1, Pl.'s Local Rule 56(a)(2) Statement at ¶ 19; Dkt. #50-6, Ex. J to Pl.'s Cross-Mot. at 2].

Defendants first point to 8 U.S.C. §§ 1427(a)(3), 1101(f)(8), and 8 C.F.R. § 103.2(b)(1) in support of their claim that Plaintiff's fourth-degree larceny conviction precludes consideration of his naturalization application.  8 U.S.C. § 1427(a)(3) states that "[n]o person . . . shall be naturalized unless such applicant . . . during all periods referred to in this subsection has been and still is a person of good moral character . . . ."  "The statutory period during which good moral character is to be assessed is 'five years immediately preceding the date of filing his application . . . up to the time of admission to citizenship.'"  *Rico v. INS*, 262 F. Supp. 2d 6, 9 (E.D.N.Y. 2003) (quoting 8 U.S.C. §§ 1427(a)(1)-(2)).  8 U.S.C. §1101(f)(8) provides that "[n]o person shall be regarded as . . . a person of good

---

[9] Defendants' reliance on *Ajlani v. Chertoff*, 545 F.3d 299 (2d Cir. 2008) is misplaced, as the plaintiff in that case was not an honorably discharged military veteran who fell within the exception provided by 8 U.S.C. § 1440.  *See* [Dkt. #49-1, Defs.' Memo. at 17; Dkt. #53, Defs.' Reply at 8].

moral character who, during the period for which good moral character is required to be established, is or was . . . convicted of an aggravated felony . . . ." Finally, 8 C.F.R. § 103.2(b)(1) requires an applicant to show that he "is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication."

Neither the statutes nor the regulation preclude the relief sought by the Plaintiff.  While they make clear that an applicant must demonstrate good moral character up to the time of admission to citizenship, the very unique set of facts presented in this case renders the application of these requirements to the Plaintiff's naturalization application far from certain.  Specifically, the two-and-a-half decade gap in between Plaintiff's filing of his application and his commission of the aggravated felony raises the significant question of whether Plaintiff must demonstrate eligibility through the time the agency performs a long-belated court-ordered adjudication, or if instead, the Plaintiff need only show that he met all of the statutory requirements through the time in which he reasonably should have been granted citizenship, but was not.  Indeed, at least one court in this Circuit ordered USCIS to adjudicate a naturalization application despite the applicant's commission of an aggravated felony a decade after he submitted it. *See Rivera v. U.S. Citizenship & Immigration Servs.*, 5 F. Supp. 3d 439, 440-41 (S.D.N.Y. 2014) (stating that in 1995, plaintiff filed an application for naturalization, in 2005, he pled guilty to conspiracy to distribute cocaine,[10] in 2011, he filed a suit

---

[10] Conspiracy to distribute cocaine is an "aggravated felony" under Title 8.  *See* 8 U.S.C. §§ 1101(a)(43)(B), (U) (listing "[i]llicit trafficking in a controlled substance" as an aggravated felony offense and further stating that "an attempt or conspiracy to commit an offense described in this paragraph" is independently an aggravated felony).

to compel the USCIS to issue a decision on his still-pending naturalization application, and the court ordered the agency to issue a decision).

In urging the Court to take a different position, the Defendants cite three cases, *Nguyen v. USCIS*, No. 1:09-cv-2211, 2010 WL 3521911 (M.D. Pa. 2010), *Vernon v. Attorney General of the United States*, 181 F. App'x 201 (3d Cir. 2006); *Marquez-Almanazar v. INS*, 418 F.3d 210 (2d Cir. 2005).  *See* [Dkt. #49-1, Defs.' Memo. at 21-22; Dkt. #53, Defs.' Reply at 10-11].  None of them compel a different result.

In *Nguyen*, the petitioner sought *nunc pro tunc* relief to file, *for the first time*, a naturalization application following a series of arrests which led to a final order of removal.  *Nguyen*, 2010 WL 3521911 at **1, 4.  While the petitioner's father did file a certificate of citizenship for his children, including the petitioner, the certificate predated the petitioner's arrests and removal order, and it was never adjudicated, the petitioner conceded that he did not meet the requirements for derivative citizenship at the time his father filed the application.  *Id.* at *6.  Indeed, at no point was the petitioner eligible for derivative citizenship because he was already eighteen years old by the time his mother naturalized.  *Id.* at *1.  Nothing on the record before this Court suggests that the Plaintiff was ineligible for citizenship within a reasonable time after his citizenship application was filed.  On the contrary, the record establishes that he was eligible for years after he filed his application, arguably more than a reasonable time after it was filed, and for many years before he sustained the convictions which led to his deportation.

*Vernon* likewise does not support the Defendants' position.  There, the plaintiff, after being honorably discharged, filed a naturalization application on

August 5, 1986.  *Vernon*, 181 F. App'x, at 202.  The agency scheduled an examination date for January 8, 1987, but the plaintiff did not appear, as he claimed that he was never notified of the date.  *Id*.  Twelve days later, on January 20, 1987, the INS closed his naturalization proceedings.  *Id*.  Many years later, after a series of minor offenses, the plaintiff was convicted under the felon-in-possession statute, an aggravated felony.  *Id*.  While the court declined to order the INS to complete its naturalization adjudication *nunc pro tunc*, it did not do so on the basis of the plaintiff's aggravated felony.  *Id*. at 203.  Instead, in this unreported decision, the Third Circuit declined to order a *nunc pro tunc* review because the plaintiff "offer[ed] no excuse or explanation as to why he never sought clarification or reconsideration of his application for naturalization from the time he filed it in 1986 until he raised it as an issue . . . seventeen years later."  *Id*.  While the Court recognizes that the Plaintiff bears some of the responsibility for the decades-long delay in resolving his naturalization application, it declines to adopt the position taken in *Vernon*, a non-binding decision, given the INS's multiple violations of the APA in the course of its review of Plaintiff's application.

Further, the Plaintiff's last communication with INS indicated that he thought his application was still under consideration and that he had satisfied all of the application requirements by presenting evidence that his prosecution had been suspended.  The legal significance of a *nolle prosequi* is often misconstrued by lay persons and misperceived to be a final resolution of their case.  Thus, the Plaintiff's impression, albeit wrong, was not unreasonable, and unlike in *Vernon,* there is no clear evidence that the Plaintiff abandoned his application for citizenship.

Finally, in *Marquez-Almanazar*, the plaintiff, an honorably-discharged veteran, filed a naturalization application *after* removal proceedings had already begun. *Marquez-Almanazar*, 418 F.3d at 213. The removal action was predicated on the plaintiff's prior conviction for possession and attempting to sell cocaine, an aggravated felony under the immigration statutes. *Id*. at 212. Thus, the aggravated felony predated his naturalization application, and the Second Circuit simply held that the relaxed requirements for certain military personnel prescribed in 8 U.S.C. § 1440 did not extend to the standards governing the good moral character requirement. *See id*. at 219. The present case is clearly distinguishable, as the Plaintiff here did not seek citizenship to avert deportation, but rather, he sought citizenship many years before he could have had any inkling that he would be deported.

In a case such as this one, construing the applicable statutes and regulations as requiring an applicant to demonstrate naturalization eligibility for decades beyond when their application should have been adjudicated and they should have attained citizenship could be highly prejudicial, particularly where the agency engaged in significant undue delay. However, the Court finds that the questions of how to interpret these statutes and regulations in the context of this case and what information the agency can and should consider in adjudicating the Plaintiff's naturalization application should be resolved by the agency on remand.

**C.**     **Neither of the Defendants' Affirmative Defenses Succeed**

Defendants raise the statute of limitations and the doctrine of laches, each of which they claim bars the relief Plaintiff seeks. However, under the law of this

Circuit, neither of these doctrines is applicable.

Absent a defined statute of limitations period, a civil action against an agency of the United States must be filed within six years "after the right of action first accrues."  28 U.S.C. § 2401(a).  With regard to procedural violations brought under the APA, the statute of limitations for such claims does not begin to run until the agency action becomes final.  5 U.S.C. § 704; *see also Sai Kwan Wong v. Doar*, 571 F.3d 247, 263 (2d Cir. 2009).  In determining whether an agency action is sufficiently final to trigger the running of the statute of limitations, the "core question" is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Dalton v. Spector*, 511 U.S. 462, 470, 114 S. Ct. 1719, 1725 (1994) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 112 S. Ct. 2767, 2773 (1992)).  As explained above, Plaintiff's naturalization application is still pending and has not been adjudicated.  No decision, final or otherwise, has been made on it.  Plaintiff's application was designated "nonfiled," reopened, and at some point years later, his file was "archived" without ever being denied and without ever notifying Plaintiff.  Accordingly, the statute of limitations has not yet commenced, let alone run on Plaintiff's claim.  The Plaintiff cannot equitably be expected to challenge agency action of which he was never made aware, especially in a circumstance like this in which there was no specified deadline by which the agency was required to act.  To hold otherwise would create a statute of limitations trap.

Defendants' laches defense similarly fails.  First, there is some authority in this Circuit holding that because the statute of limitations in this action has not run, a laches defense is unavailable.  *See U.S. v. RePass*, 688 F.2d 154, 158 (2d

Cir. 1982) ("Laches is not a defense to an action filed within the applicable statute of limitations."); *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, No. 83 Civ. 5401 (DC), 1997 WL 278116, at *3 (S.D.N.Y. May 23, 1997) (Chin, J.) ("[I]t is the law of this Circuit that laches may not be asserted as a defense if the applicable statute of limitations has not run.").  At the very least, the fact that the statute of limitations has not yet even begun to run is "an important determinant in the application of a laches defense." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996).  Indeed, the Second Circuit has expressly rejected efforts by the government to assert the defense in connection with claims subject to the general six-year statute of limitations for suits against the United States when the limitations period had not yet run. *See Ikelionwu v. United States*, 150 F.3d 233, 237-38 (2d Cir. 1998) (reversing district court's dismissal of suit challenging government seizure of personal property on laches grounds and stating that "[i]t is also not without significance that [plaintiff's] claim is timely under the applicable statute of limitations").

Second, even if the fact that the limitations period has not yet run does not alone preclude a laches defense, the Defendants remain unable to avail themselves of it.  "Laches is based on the maxim, '*vigilantibus non dormientibus aequitas subvenit*,' meaning 'equity aids the vigilant, not those who sleep on their rights.'" *Ikelionwu*, 150 F.3d at 237 (citation and quotations omitted).  "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Id.* (citing *Tri-Star Pictures, Inc. v. Leisure Time Prod., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994)).  However, laches is

**28**

an equitable defense that is "committed to the sound discretion of the trial judge." *Whitserve LLC v. GoDaddy.com, Inc.,* No. 3:11-cv-00948 (WGY), 2015 WL 4464476, at *4 (D. Conn. Jul. 21, 2015).  Accordingly, courts have declined to apply the defense when the party seeking to invoke it has contributed to the inexcusable delay.  *See Clarke v. Commc'ns Workers of Am.*, 318 F. Supp. 2d 48, 57-58 (E.D.N.Y. 2004) (citing *King v. Innovation Books*, 976 F.2d 824, 833 (2d Cir. 1992)).  Here, the failure of the agency to notify Plaintiff, at any point, that his application had been designated non-filed, deemed abandoned, or archived, materially contributed to the extensive delay in Plaintiff's bringing this case.  This appears to be a case in which both parties have acted in a dilatory manner, and thus, neither should be able to seek refuge in a doctrine that "aids the vigilant." *Ikelionwu*, 150 F.3d at 237 (citation and quotations omitted).

Finally, the INS inquiry into the status of the Plaintiff's criminal prosecution and eligibility for citizenship was wanting.  Under Connecticut law, a *nolle prosequi* ripens into a dismissal and an erasure thirteen months after it is entered, provided that the individual charged does not violate the law.  *See Cislo v. City of Shelton*, 240 Conn. 590, 607, 692 A.2d 1255, 1264-65 (Conn. 1997) ("[T]he legislature in 1973 and 1974 . . . perceived that . . . some additional procedural protection for a defendant whose case had been nolled was necessary, namely, the automatic erasure of records of nolled cases . . . following the requisite thirteen month period," which has "the same practical effect as would the immediate erasure of records in dismissed cases . . . ."); *see also* Conn. Gen. Stat. § 54-142a(c)(1).  Thus, INS could have determined the Plaintiff's eligibility for citizenship by commissioning a criminal records check.  If such a check revealed

29

that the Plaintiff had not been charged with a criminal offense subsequent to the entry of the *nolle,* the INS would have known that the charges had been dismissed and the Plaintiff was eligible for citizenship.  Here, the INS's inquiry into the status of the Plaintiff's criminal offense was lacking, depriving the INS of the equitable defense of laches.

IV.   <u>Conclusion</u>

For the foregoing reasons, the Court assumes jurisdiction over this matter, GRANTS Plaintiff's Cross-Motion for Summary Judgment, DENIES the Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, REMANDS this matter back to Defendant USCIS, and ORDERS the agency to perform all acts necessary to enable review of Plaintiff's application and to render a timely decision on Plaintiff's naturalization application.

IT IS SO ORDERED, ADJUDGED AND DECREED, this 17th day of March 2016, Hartford, Connecticut

_____/s/_____
Vanessa L. Bryant,
United States District Judge